UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **PEGGY A. OWENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-0346-CVE-FHM |
| | ) | |
| **RESOURCE LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. # 55). Plaintiff Peggy A. Owens ("Mrs. Owens") filed suit in Tulsa County, Oklahoma for breach of contract and breach of the implied covenant of good faith and fair dealing based on defendant Resource Life Insurance Company's ("Resource") denial of death benefits under the insurance policy ("Policy") between Doug Owens ("Mr. Owens") and Resource. Defendant filed a notice of removal (Dkt. # 2) on July 5, 2006. Defendant now asks the Court to grant summary judgment on both of plaintiff's claims. For the reasons set forth below, the Court grants in part and denies in part defendant's motion.

I.

Mr. Owens purchased a vehicle from United Ford of Tulsa, Oklahoma ("United Ford") on May 4, 2004. As part of that transaction, he applied for credit life insurance from Resource, naming Ford Motor Credit as the primary beneficiary and Mrs. Owens as the secondary beneficiary. The application included the following question ("Question 1"): "Are you now receiving or have you received within the 12 months preceding this application: medical care, diagnosis or treatment for

any diseases of the brain, arteries, heart, kidneys, liver or lungs, high blood pressure, cancer, diabetes, multiple sclerosis or mental disorders?" Dkt. # 55, Ex. 1; Dkt. # 55, Ex. 2; Dkt. # 68, Ex. A. Following this question, the applicant is directed to check either the "yes" box or the "no" box.

There are two different versions (and three different copies) of Mr. Owens' signed application. In the version maintained by Mrs. Owens, which she contends is a carbon (the customer) copy of Mr. Owens' original application for life insurance, the "yes" box is checked and the "no" box is marked by two intersecting lines following Question 1. Dkt. # 68, Ex. A; Dkt. # 55, Ex. 2. The mark in the "no" box could be an "X" or it could be a check-mark with a line through it. No initials appear on the Owens' copy of the application. Id. By contrast, on Resource's copy of Mr. Owens' application, there are marks in both boxes; the "yes" box appears to have a "scribble" through it; and the "no" box has a mark like that in Mrs. Owens' copy. Dkt. # 55, Ex. 1. Between the "yes" and "no" boxes is a mark, which arguably could be initials.[1]

After Mr. Owens filled out the Resource application, the application was submitted to Trent Lott ("Lott"), a United Ford employee. Dkt. # 67, Ex. B, Deposition of Trent Lott, at 8. As part of his duties, Lott received the life insurance applications, photocopied the applications, and sent them to Resource. United Ford's copy of Mr. Owens' application mirrored that of Mrs. Owens' copy; it did not have initials and had marks in both the "yes" and "no" boxes to Question 1. Lott mailed the original application to Resource on May 21, 2004. Id. at 30. He testified that, from the time he received the application until he mailed it to Resource, no one at Resource was in possession of the application. Id.

---

[1] A jury could also find that the "initials" are actually the word "yes" written out.

Resource received Mr. Owens' application on May 25, 2004. Dkt. # 67, Ex. D, Deposition of Marilyn Hill, at 6. The following day, on May 26, 2004, the application was stamped by Angela Donahue ("Donahue"), a data entry clerk at Resource. Donahue "keyed" Mr. Owens' application into the computer system that day.[2] Id. at 38-39. According to Resource policies and procedures, if there were any questions concerning an application, such as a missing signature, or a missing date of birth, or another ambiguity, then the application would be sent to the Client Services department at Resource. Dkt. # 67, Ex. F, Deposition of Tim Dubois, at 8. Donahue sent Mr. Owens' application to Stacy Bridgewater ("Bridgewater"), an employee in the Client Services department, who reviewed the application on May 27, 2004. Id. The application was reviewed a second time on May 27, 2004 by Latosha Harris ("Harris"). Id. at 40. After Bridgewater and Harris reviewed Mr. Owens' application, it was accepted.[3] According to Resource general policies, the application was copied onto microfilm, and the original application itself was shredded. Dkt. # 67, Ex. F, Deposition of Tim Dubois, at 11. Thus, Resource has the microfilm copy of Mr. Owens' application only, and not the original application.

According to Resource policies, "any affirmative response to a health question is automatically declined coverage." Dkt. # 67, Ex. E, Deposition of Meikel Cobb, at 5. Also, when there is an ambiguous answer to an application question, Resource sends a letter to the customer and

---

[2] Donahue testified that she does not specifically remember Mr. Owen's application. During her deposition, Donahue reviewed Mr. Owen's application and stated that she was "not sure whether they are initialling [sic] yes or no." Dkt. # 153, Ex. Q, Deposition of Angela Donahue, at 40.

[3] Neither Bridgewater nor Harris remembers Mr. Owens' application, but they reviewed Resource's microfilm copy at their depositions. Dkt. # 173, Ex. 2, Deposition of Stacey Bridgewater, at 42; Dkt. # 173, Ex. 3, Deposition of Latosha Harris, at 24.

3

asks for clarification. Id. De'Laina Von Hagel ("Von Hagel"), a risk specialist and underwriter at Resource, stated that Resource assumed the risk of coverage if it issued coverage based on its interpretation of an ambiguous response to an health question. With respect to Mr. Owens' application, Resource never sent Mr. Owens a letter stating that the application was ambiguous or that it needed clarification as to Question 1. Resource issued the policy to Mr. Owens based on its understanding that Mr. Owens' unambiguously answered "no" to Question 1.

In their depositions, several Resource employees testified that they did not find Mr. Owens' application to be confusing with respect to his answer to Question 1. They stated that the mark in the "yes" box next to Question 1 was scratched out and initialed, and the "no" box was marked; this indicates that Mr. Owens changed his answer from "yes" to "no." See Dkt. # 67, Ex. D, at 13; Dkt. # 67, Ex. H, Deposition of Laurie Schram, at 7; Dkt. # 67, Ex. K, Deposition of Stacy Woodward, at 6-7. Dkt. # 67, Ex. L, Deposition of Barrett Doss, at 4-5; Dkt. # 67, Ex. M, Deposition of Clara Sanchez, at 5; Dkt. # 153, Ex. S, Deposition of Latosha Harris, at 36. Under this interpretation of Mr. Owens' answer to Question 1, Resource accepted Mr. Owens' application because he indicated that he had not received medical treatment for the diseases, including cancer, listed in Question 1. However, three Resource employees testified that they thought Mr. Owens' response to Question 1 was confusing due to marks in both the "yes" and "no" boxes. Dkt. # 67, Ex. F, Deposition of Tim Dubois, at 13; Dkt. # 67, Ex. J, Deposition of Suzanne Hughes, at 4; Dkt # 153, Ex. R, Deposition of Stacey Bridgewater, at 31-32.

On June 30, 2005, Mrs. Owens submitted a claim for benefits under the Policy. Dkt. # 55, Ex. 3. In the claim form, she stated that Mr. Owens' cause of death was "non small cell carcinoma of the lung." Id. On July 16, 2005, Jim Clark sent Mrs. Owens an acknowledgment of claim letter.

4

Dkt. # 55, Ex. 4.  Clara Sanchez ("Sanchez"), a senior claims analyst at Resource, sent Mrs. Owens another letter on July 19, 2005, stating:

> When Mr. Owens applied for insurance with our Company on May 3, 2004, a statement was signed certifying, among other things, that he was not receiving or had received within the 12 months preceding the date of the application, medical care, diagnosis or treatment for any disease of the brain, arteries, heart, kidneys, liver or lungs, high blood pressure, cancer, diabetes, multiple sclerosis or mental disorders. Insurance coverage was issued based on the representations made in this application.
>
> We have found it necessary to request additional information regarding the past medical history and treatment of Mr. Owens as it related to the insurance contract and claim.

Dkt. # 55, Ex. 5.  Sanchez notified Mrs. Owens that they had contacted Mr. Owens' previous physicians and requested the names and addresses of other healthcare providers that Mr. Owens consulted in the three years prior to his death.  Id.  Sanchez also called Mrs. Owens on July 19, 2005 to discuss the matter with her.

On July 25, 2005, Tim Dubois ("Dubois") called Mrs. Owens to discuss Mr. Owens' medical history.  Dkt. # 55, Ex. 7.  Mrs. Owens told Dubois that Mr. Owens had been diagnosed with cancer in 2003 and that it had been in remission until early 2005.  Id.  On July 26, 2005, Dubois wrote to Mrs. Owens and informed her that Mr. Owens' claim was being investigated.  Dkt. # 55, Ex. 9.  He included a copy of Mr. Owens' application (presumably the Resource's copy with the initials between the "yes" and "no" boxes in Question 1) and asked Mrs. Owens to submit any information that she wished to be considered.  Id.  The letter stated, "any additional information you may wish to submit will be considered.  Upon receipt of the additional information requested of you and with the continued evaluation of this claim, we will keep a good faith payment (not an acceptance of liability) to the creditor, Ford Motor Credit, under consideration.  If you have any questions, please do not hesitate to contact our office."  Id.  On August 8, 2005, Dubois again wrote to Mrs. Owens

regarding the status of her claim. Dkt. # 55, Ex. 10. He informed her that Resource had not received all of the information pertaining to Mr. Owens' heath history. Id.

On August 18, 2005, Suzanne Hughes ("Hughes") wrote to Mrs. Owens and informed her that her claim was being referred to the Resource Life Underwriting Department to review "whether or not a valid Contract of Insurance has existed between Mr. Owens and our Company." Dkt. # 55, Ex. 11. The claim was referred to the underwriting department, specifically to Von Hagel, on that day. Dkt. # 55, Ex. 12.

Von Hagel determined on August 23, 2005 that there existed sufficient material to support rescission of the Policy based on Mr. Owens' medical records showing his history of carcinoma. Dkt. # 55, Ex. 12. Hughes then sent a letter to Mrs. Owens on August 26, 2005 stating that "at the time Mr. Owens applied for the insurance coverage, he was under treatment for squamous cell carcinoma, which is a material medical condition." Dkt. # 55, Ex. 13. She informed Mrs. Owens that the Policy "is rescinded as of the effective date and our obligation is limited only to a refund of premiums paid for coverage less any good faith contingency payments." Id. Resource also sent Ford Motor Credit a letter notifying it of Resource's rescission of Mr. Owens' Policy and of Resource's full refund to Ford Motor Credit of all premiums paid, minus good faith payments. Dkt. # 55, Ex. 14.

On December 15, 2005, Resource received a letter from R. Jack Freeman ("Freeman"), Mrs. Owens' attorney, requesting that Resource contact him to discuss its denial of Mr. Owens' benefits. Dkt. # 55, Ex. 15. Resource called and left a message for Freeman on December 20, 2005. Dkt. # 55, Ex. 16. Dwight Dickson ("Dickson"), a Resource claims analyst, sent Freeman a letter on

December 28, 2005 stating that the Policy "was rescinded due to a misrepresentation on [Mr. Owens'] application for coverage." Dkt. # 55, Ex. 18.

On April 26, 2006, Freeman sent Resource a letter stating that there was "no factual basis to justify your company's denial of the claim for payment of the policy benefits to Mrs. Owens." Dkt. # 55, Ex. 19.  He continued, "Please take notice that unless Mrs. Owens' claim is paid in full within the next 10 days, Mrs. Owens will be filing suit to collect what is owed to her under the policy."  Id.

Schram replied to Freeman on May 4, 2006, informing him that Resource had requested additional information from United Ford regarding the application.  Dkt. # 55, Ex. 20.  On May 5, 2006, Schram spoke with Glenda Barnwell ("Barnwell") of United Ford.  At this time, Schram discovered that United Ford's copy of Mr. Owens' application was different from Resource's copy. See Dkt. # 55, Ex. 21.  After learning of this discrepancy, Schram wrote Freeman requesting that Freeman send her the Owens' copy of the application.  Dkt. # 55, Ex. 22.  Freeman responded on May 9, 2006 and refused to send the Owens' copy.  He stated, "So, whether or not the insured's copy of the application was initialed (it was not) is immaterial to the issue at hand.  The simple fact is that the original (a copy of which Mr. Dickson [of Resource] provided to me) was initialed, clearly indicating an affirmative answer to the question at issue."  Dkt. # 55, Ex. 23.

On May 10, 2006, Schram wrote to Stacy Woodward ("Woodward"):

In reviewing the application again, it does not appear the "yes" answer was crossed out, so what the attny [Freeman] appears to be contending is that question #1 was originally marked no, then initialed to show the correct answer to be "yes."  If any answer was actually marked out as incorrect (based on looking again at the appl), it would be the "no" answer.

Either way, I think it in our best interest to reverse the rescission, reinstate coverage, and pay the claim.

7

Dkt. # 55, Ex. 24. Woodward replied in a hand-written note: "Agree – reverse – since we cannot explain exactly what happened we will construe in the INSURED'S favor." Id. The same day, Schram sent Freeman a letter, stating:

> We have reviewed your letter, and after such review, are better able to understand what appears to be your argument. In further review of the Certificate application, it would appear that whether or not Mr. Owens initialed any change to question number one, the check mark in the "yes" box was not crossed out, and as such, we must construe that the intention was for this question to be answered in the affirmative. At the very least, and in the absence of having been present at enrollment to fully understand exactly what happened, the answer to question one being marked both "yes" and "no" certainly raises a doubt about the intention of how such question was to be answered.
>
> Under the circumstances, we are reversing our rescission and reinstating coverage under [the Policy].

Dkt. # 55, Ex. 25.

On May 11, 2006, Resource sent Mrs. Owens a letter confirming that the benefits under the Policy were provided to Ford Motor Credit "and remaining liability plus interest in the amount of $6,195.22 has been sent to your attorney, Mr. R. Jack Freeman." Dkt. # 55, Ex. 26. Resource issued a payment to Ford Motor Credit in the amount of $13,565.37. It sent a check to Freeman for $6,195.33, which included the remaining liability of the claim ($5,481.78) plus interest ($713.55).[4]

---

[4] On June 21, 2007, more than six months after the close of discovery, plaintiff filed a motion requesting permission to supplement her response to defendant's motion for summary judgment with additional evidence on the issue of damages. Specifically, plaintiff asserted that she incurred $5,000 of attorney's fees to obtain policy benefits before this case was filed, and her attorney mistakenly omitted this as an element of damages in the complaint. Plaintiff admits that the law does not expressly permit the recovery of attorney's fees in a breach of contract action, but she has a good faith argument to extend existing Oklahoma law. The magistrate judge denied plaintiff's motion to supplement her response with additional evidence of damages, and the Court adopts the magistrate judge's finding. Dkt. # 181, at 3 ("Considering that the information Plaintiff is now trying to disclose is not newly discovered evidence but is information she has possessed the entire length of the litigation, Plaintiff's attempted late disclosure is too late.").

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Mrs. Owens claims that Resource breached its contractual duties under the Policy and that Resource breached the implied covenant of good faith and fair dealing by dishonestly intending to deprive Mrs. Owens of the Policy benefits and by refusing "to fairly and adequately investigate Mr. Owens' claim for benefits under the Policy." Dkt. # 2, Petition, ¶ 15.

**A.**

In order to prevail on a claim for breach of contract, plaintiff must prove that: (1) a contract was formed between the parties; (2) Resource breached the contract; and (3) plaintiff suffered damages as a result of that breach. See Young v. Thomas, 930 P.2d 836, 839 (Okla. Civ. App. 1996). Here, after Resource accepted Mr. Owens' application for life insurance, a question arose as to whether a valid contract existed between Mr. Owens and Resource. Resource informed Mrs. Owens that it would review her claim to determine "whether or not a valid Contract of Insurance has existed between Mr. Owens and our Company." Dkt. # 55, Ex. 11. At that time, Resource interpreted its copy of Mr. Owens' application to mean that he answered "no" to Question 1, thereby representing that he had not suffered from the diseases or health issues listed in that question. Once Resource discovered that Mr. Owens had been treated for cancer, Resource rescinded the contract on the ground that Mr. Owens had made a material misrepresentation in the application. However, when Resource became aware that another copy of the application existed, it reevaluated its decision to rescind the contract. At that point, Resource acknowledged that, construing the application in the insured's favor, a valid contract existed under which Mrs. Owens was entitled to benefits. Thus, despite Resource's initial position that there did not exist a valid contract, the parties agree, at least for summary judgment purposes, that the first element of the breach of contract claim is satisfied.

Resource argues, however, that there is no genuine issue of material fact concerning a breach of contract or damages. Although Resource initially refused to make payments under the Policy on the ground that Mr. Owens misrepresented his health condition, Resource later decided to "reverse the rescission, reinstate coverage, and pay the claim." Dkt. # 55, Ex. 24. It is undisputed that Resource paid Ford Motor Credit, the primary beneficiary under the Policy, $13,565.37. It also paid plaintiff, the secondary beneficiary under the Policy, $6,195.33, which included the remaining liability of the life claim ($5,481.78) plus interest ($713.55). Plaintiff does not dispute that Resource paid her the $6,195.33. Dkt. # 67, Ex. O, Deposition of Peggy Owens, at 4. Given its payment of the Policy benefits, Resource maintains that it did not breach the contract and that plaintiff has suffered no damages.

In her deposition plaintiff indicated that Resource had paid her in full for her monetary loss:

Q: And any amount of money that you may have paid off or paid during the period of time of $6,100 and chance, which represented the amount you paid plus accrued interest, had been returned to you, correct?

A: Yes.

Id. She indicated in her deposition that the only additional damages were emotional distress. Id. However, after her deposition, plaintiff submitted an errata "correction," stating: "I paid $78.85 in additional service charges to Ford Motor Credit, which have not been reimbursed by Resource Life." Dkt. # 55, Ex. 29. She explained that the reason for the correction was that she "understood the [deposition] question to be asking only about the principal and interest on the loan." Id.

In its motion for summary judgment, Resource asks the Court to disregard the correction to Mrs. Owens' deposition testimony because she was attempting to create a "sham fact issue." According to the Tenth Circuit, a contradicting affidavit can be disregarded if it creates a sham fact

issue. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965 (10th Cir. 2001). The Court should not disregard a contradicting affidavit merely because it conflicts with the affiant's prior sword testimony. Id. at 973. Rather, the Court should consider the following factors:

> whether (1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.

Id. (citations and internal quotations omitted). Here, the conflicting testimony is not an affidavit, but a correction to Mrs. Owens' deposition testimony. However, the same principles set forth in Ralston apply in determining whether to disregard the correction to Mrs. Owens' previous sworn deposition testimony. See Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000). Mrs. Owens could have been cross-examined after defendant's counsel deposed her[5], and her correction did not set forth newly discovered evidence.

The Court finds no evidence that Mrs. Owens acted with the intent to mislead defendants or used her errata to create a sham factual issue, but that does not mean the Court must consider her errata when ruling on defendant's motion for summary judgment. Defendant argues that the $78.85 "cannot be considered as part of [plaintiff's] breach of contract claim, for she never submitted a claim for $78.85 to the Defendant." Dkt. # 55, at 11. Defendant argues that, because plaintiff did not submit a claim for $78.85, "Defendant could not have breached the contract by failing to pay $78.85." Id. In addition, defendant argues that plaintiff did not submit her errata within the discovery cutoff and the errata should not be considered by the Court. Plaintiff responds that a witness may review her deposition and make corrections under Fed. R. Civ. P. 30(e):

---

[5]  It is not clear from the summary judgment record whether Mrs. Owens was, in fact, cross-examined after defendant's counsel deposed her.

12

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

Fed. R. Civ. P. 30(e).

For several reasons, the deposition errata should not be considered when ruling on the defendant's motion for summary judgment. The deposition errata was submitted outside of the discovery cutoff and plaintiff did not request leave of court to exchange discovery materials after the discovery cutoff. The discovery cutoff was December 1, 2006, and Mrs. Owens submitted her errata on December 15, 2006. Plaintiff clearly disclosed the errata outside of the discovery cutoff. Defendant is entitled to reasonably rely on the evidence disclosed by initial disclosures and during discovery when drafting its motion for summary judgment, and it should not be required to address evidence that was not disclosed in a timely manner, especially when this evidence was in plaintiff's possession throughout the litigation.

Plaintiff argues that her deposition was taken within the discovery cutoff, even if the errata was disclosed afterward, and she should be allowed to correct her deposition testimony under Rule 30(e). However, plaintiff's deposition errata constitutes a material change to her deposition testimony. Defense counsel asked Mrs. Owens about all of her out of pocket expenses, not just principal and interest on the loan and, even if she understood the question to refer to principal and interest on the loan, there was no reason for her to narrowly construe defense counsel's question in that manner. In this case, Mrs. Owens changed her affirmative response that all out of pocket

expenses were paid by Resource, to a denial. This is a substantial change to her response and this type of information should have been exchanged within the discovery cutoff.

Rule 30(e) does not permit parties to make material changes to deposition testimony. See Garcia v. Pueblo County Club, 299 F.3d 1233 (10th Cir. 2002) ("We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony."); Saffa v. Oklahoma Oncology, Inc., 405 F. Supp. 2d 1280, 1284 (N.D. Okla. 2005) (errata sheet should be stricken when changes to deposition testimony constitute a "material alteration"). The purpose of Rule 30(e) is to allow corrections to the reporter's transcript or to correct formal errors, but deponents may not make wholesale changes to the substance of their deposition testimony. One court has stated that:

> The purpose of Rule 30(e) is obvious. Should the reported make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e.., he reported the name to be "Lawrence Smith" but the proper name in "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992). The Court will not permit Mrs. Owens to amend her deposition responses to defense counsel's questions affirming that all out of pocket expenses were paid by Resource, because such changes are not permitted under Rule 30(e).

The Court finds that defendant's motion for summary judgment should be granted as to plaintiff's breach of contract claim, because Resource has paid the contract amount. Transpower Constructors v. Grand River Dam Authority, 905 F.2d 1413, 1416 (10th Cir. 1990); Young, 930 P.2d at 839. Resource has paid all of the timely disclosed damages owed to plaintiff under the Policy and, even if Resource originally breached the Policy, plaintiff has received her remedy. Therefore,

there is no genuine issue of material fact and summary judgment in favor of defendant is appropriate on this claim.

**B.**

Defendant argues that it is entitled to summary judgment on plaintiff's claim for bad faith. In support of this argument, defendant offers two arguments: (1) plaintiff can not pursue a bad faith claim if she does not have a viable breach of contract claim; and (2) the facts show that a legitimate coverage disputed existed and plaintiff can not factually prevail on her claim for bad faith.[6]

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured." Christian v. Am. Home Assurance Co., 577 P.2d 899, 904 (Okla. 1977). Violation of this duty gives rise to an action in tort. Id. "The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions." Conti v. Republic Underwriters Ins. Co., 782 P.2d 1357, 1360 (Okla. 1989). The Oklahoma Supreme Court and the Tenth Circuit have made clear that an insurer does not subject itself to a claim of bad faith merely by disputing coverage. "The insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.'" Thompson v. Shelter Mut. Ins., 875 F.2d 1460, 1462 (10th Cir. 1989) (citing Manis v. Hartford Fire Ins. Co., 681 P.2d

---

[6]  Defendant also argues that plaintiff's claim for emotional distress damages is not cognizable, because she has no legal claim to support recovery for this type of damages. However, if the Court finds that plaintiff can proceed with her claim for bad faith, she can recover damages for emotion distress if she prevails at trial. Timmons v. Royal Globe Ins. Co., 653 P.2d 907, 916 (Okla. 1982). Plaintiff makes no attempt to argue that she has a claim for intentional infliction of emotional distress and, although defendants preemptively briefed this issue, there is no need for the Court to consider it. It is clear that plaintiff will be able to recover damages for emotional distress only if her claim for bad faith survives summary judgment.

760, 762 (Okla. 1984)). "The decisive question is whether the insurer has a 'good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.'" Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1109 (Okla. 1991) (quoting Buzzard v. McDanel, 736 P.2d 157, 159 (Okla. 1987)). In order to succeed on a claim for bad faith, the claimant must be able to prove that the insurer's actions went beyond an act of simple negligence; however, it is not necessary to prove that the insurer acted recklessly to prove liability, even though recklessness is a requirement for punitive damages in a bad faith claim. Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1094 (Okla. 2005). The Court can consider only the "facts known or knowable about the claim at the time the insured requested the insurer to perform its contractual obligation." Sims v. Travelers Ins. Co., 16 P.3d 468, 471 (Okla. Civ. App. 2000); see also Timberlake Construction Co. v. United States Fidelity & Guaranty Co., 71 F.3d 335, 340-41 (10th Cir. 1995).

Defendant argues that plaintiff lacks a legal basis for her bad faith claim, because the Court has granted summary judgment on her breach of contract claim. Under Oklahoma law, a necessary part of any bad faith claim is that plaintiff must show that she has a valid claim under the insurance policy. Christian, 577 P.2d at 904-05; Phillips v. Oklahoma Farmers Union Mut. Ins. Co., 867 P.2d 1361, 1363 n.10. (Okla. Civ. App. 1993). The Oklahoma Supreme Court has stated that "a determination of liability under the contract is a prerequisite to a recovery for bad faith breach on an insurance contract." Davis v. GHS Health Maintenance Org., Inc., 22 P.3d 1204, 1210 (Okla. 2001). However, there is no Oklahoma precedent expressly requiring that a plaintiff also file, or be able to file, a breach of contract claim in order to proceed with a claim for bad faith. This Court, interpreting Tenth Circuit and Oklahoma Supreme Court precedent, has previously held that "breach of contract and bad faith claims are separate bases for recovery, even though 'indemnity for loss'

is the centerpiece for both types of claims." Roemer v. State Farm Fire & Cas. Co., 2007 WL 527863, at *5 (N.D. Okla. Feb. 14, 2007) (unpublished disposition).

Defendant claims that Roemer is distinguishable. In Roemer, this Court held that the plaintiff could proceed with a bad faith claim even though the breach of contract claim was barred by the statute of limitations. Id. at 4-6. Defendants suggest that the plaintiff in Roemer was allowed to proceed with a claim for bad faith only because the plaintiff could have pursued a claim for breach of contract if the claim had not been barred by a procedural limitation. However, defendant's interpretation of case law neglects a fundamental premise of Oklahoma law - a claim for bad faith and a claim for breach of contract are separate and independent bases for recovery. Taylor v. State Farm Fire & Cas. Co., 981 P.2d 1253, 1258 (Okla. 1999). In this case, plaintiff filed a claim under the Policy on June 30, 2005, and Resource did not pay plaintiff's claim until May 11, 2006. Between June 30, 2005 and May 11, 2006, Resource engaged in conduct that could arguably be described as bad faith conduct and plaintiff had a viable claim for breach of contract during that time period. The facts giving rise to plaintiff's claim for bad faith have already occurred and, whether or not Resource has now paid plaintiff benefits under the Policy, those facts will not change. Plaintiff has demonstrated that Resource was arguably liable under the Policy, even if that liability has been fully paid, and that is all that Oklahoma law requires. Under these circumstances, plaintiff has a legal basis to proceed with her claim for bad faith even though the Court has granted summary judgment in favor of Resource on plaintiff's breach of contract claim.

Resource also argues that plaintiff has no factual basis to prevail on a claim for bad faith, because a legitimate coverage dispute existed at the time Resource denied her claim. Plaintiff alleges that Resource acted in bad faith by "intending to deprive Mrs. Owens of the benefits of the

Policy when Mrs. Owens's entitlement to those benefits was clear . . . [and] refus[ing] to fairly and adequately investigate Mr. Owens' claim for benefits under the Policy." Dkt. # 2, ¶ 15. When an insured makes a claim under an insurance policy, the insurer has a duty to treat the insured with good faith and "conduct an investigation reasonably appropriate under the circumstances." Willis v. Midland Risk Ins. Co., 42 F.3d 607, 612 (10th Cir. 1994) (quoting Buzzard v. McDanel, 736 P.2d 157, 159 (Okla. 1987)). "An investigation does not meet this standard if (1) the manner of investigation hints at a sham defense or otherwise suggests that material facts were overlooked, or (2) the insurer intentionally disregarded undisputed facts supporting the insured's claim. The 'essence of such a claim, though, is always the insurer's unreasonable, bad-faith conduct.'" Sims v. Great American Life Ins. Co., 469 F.3d 870, 891 (10th Cir. 2006) (internal citations and quotations omitted).

The Court finds that there is a genuine issue of material fact concerning the adequacy of Resource's investigation under its own procedures. Several Resource employees have testified that general procedures required Resource to seek clarification of ambiguous or unclear responses to health questions. The marking on Resource's copy of Mr. Owen's application are obvious and, if Resource intended to use Mr. Owen's response to Question 1 as a basis to deny coverage, it should have investigated Mr. Owen's application immediately. According to plaintiff, "The die was cast when Resource Life rescinded the policy and denied the claim for benefits due to alleged misrepresentations in the application, even though it had previously decided that the application, contained markings on, in and around both the yes and no answers to health question 1, did not disqualify Mr. Owens from coverage." Dkt. # 67, at 15. Resource's copy of Mr. Owens' application could be interpreted in differing ways. On the one hand, it could be interpreted to mean that Mr.

18

Owens first answered "yes" to Question 1 and then changed his answer to "no"; the initials between the boxes could indicate his approval of this change. Resource initially interpreted the application in this way. On the other hand, the application could be read to indicate that Mr. Owens changed his answer from "no" to "yes." Reasonable persons could disagree about Mr. Owens' response to Question 1 based on Resource's copy of his application; this creates a genuine issue of material fact with respect to plaintiff's bad faith claim.

Plaintiff also asserts that the evidence suggests that Resource could have placed the additional markings on Mr. Owen's application, because neither Mrs. Owens' copy or United Ford's copy contain the additional writing. "Since the carbon copy maintained by Mr. Owens and the photocopy of the original which was made by United Ford are the same and do not contain the additional writing and marks it is reasonable to conclude that Resource Life's employee or employees placed them on the application." Dkt. # 67, at 20. Although Resource argues that there is no evidence to support this assertion, the Court finds that this is a reasonable inference given the facts. Although the Court makes no finding about the merits of plaintiff's argument, this is a genuine issue of material fact that the Court can not resolve when ruling on a motion for summary judgment. Because the Court finds that genuine issues of material fact exist, defendant's motion for summary judgment is denied as to plaintiff's claim for bad faith.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 55) is **granted in part and denied in part**: it is **granted** with respect to plaintiff's claim for breach of contract; it is **denied** with respect to plaintiff's claim for bad faith.

**DATED** this 5th day of September, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT